1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2

3

4   DARNELL AUSTIN, on behalf of      )
    himself and all others           )
5   similarly situated,              )
                    Plaintiff,       )
6                                     )
                                      )
7                                     )
    vs.                              )  CA No. 17-12498-IT
8                                     )
                                      )
9   DOOR DASH, INC.,                 )
                    Defendant.       )
10

11

    BEFORE:   THE HONORABLE JUDGE INDIRA TALWANI
12

13

     HEARING ON MOTION TO COMPEL ARBITRATION AND DISMISS COMPLAINT
14

15

16

            John Joseph Moakley United States Courthouse
17                   Courtroom No. 9
                  One Courthouse Way
18                Boston, MA 02210
                 Monday, May 14, 2018
19                   2:49 p.m.

20

21

22              Cheryl Dahlstrom, RMR, CRR
                  Official Court Reporter
23      John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3510
24                Boston, MA 02210
            Mechanical Steno - Transcript by Computer
25

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFF:

3         LICHTEN & LISS-RIORDAN, P.C.
          By:  Shannon Liss-Riordan, Esq.
4              Adelaide H. Pagano, Esq.
          729 Boylston Street
5         Boston, Massachusetts 02116

6

     ON BEHALF OF THE DEFENDANT:
7
          LITTLER MENDELSON, P.C.
8         By:  Michael Mankes, Esq.
               Francis J. Bingham, Esq.
9         One International Place
          Boston, Massachusetts 02110
10
     Also Present:  Kelsey McPherson
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2           THE CLERK:  This is Case No. 17-cv-12498, Austin v.

3     DoorDash, Inc.  Will counsel please identify themselves for the

4     record.

5           MS. LISS-RIORDAN:  Good afternoon, your Honor.  For

6     plaintiff, Shannon Liss-Riordan.

7           MS. PAGANO:  Good afternoon, your Honor.  Adelaide

8     Pagano for the plaintiff.

9           THE COURT:  Good afternoon.

02:49 10          MR. MANKES:  Good afternoon, your Honor.  For

11    Defendant DoorDash, Michael Mankes.

12          THE COURT:  Good afternoon.

13          MR. BINGHAM:  Good afternoon, your Honor.  Francis

14    Bingham for Defendant DoorDash.

15          THE COURT:  Good afternoon.

16          MS. McPHERSON:  Kelsey McPherson, DoorDash.

17          THE COURT:  Good afternoon.  So, Ms. McPherson, I

18    don't think you have an appearance in.

19          MS. McPHERSON:  I'm the client.  I can sit in the

02:50 20    back.

21          THE COURT:  You're welcome to sit there.  I just

22    understood you to be counsel.  You're welcome to sit in front

23    of the bar, but I didn't realize that.  So thank you.  Please

24    be seated.

25          So there are a number of different issues, and I want

1   to try to work my way through slowly.  Just in terms of the

2   posture of this case, the case was filed in state court, was

3   removed here, and the motion that is in front of me is a motion

4   to dismiss and to compel arbitration.

5         MR. MANKES:  Yes, your Honor.

6         THE COURT:  Not a motion to stay.

7         MR. MANKES:  Not a motion to stay.

8         THE COURT:  Okay.  And reading through your joint

9   statement, you include that the defendant may file a motion to

02:51 10   dismiss pursuant to Rule 12(b)(6).  I don't think you get

11   multiple Rule 12 motions -- or Rule 12(b) motions.  In the

12   event that the motion would be denied, it seems to me you'd

13   need to answer and you could file a 12(c).  But I was just --

14   when I saw the 12(b)(6), I think your motion to dismiss is your

15   12(b) motion.

16         MR. MANKES:  Yes, your Honor.  That's our motion.  And

17   in the alternative it could be the stay, but I think we've

18   brought it as a motion to dismiss and compel arbitration.

19         THE COURT:  If I were to deny -- I'm just trying to

02:51 20   sort of go through and make sure I have everything in front of

21   me.  What you filed was a 12(b) motion.  If I deny your 12(b)

22   motion, you have to answer and you can file a 12(c).  But I

23   just -- I caught your wanting to file a second 12(b)(6), and I

24   don't want a second 12(b)(6).

25         MR. MANKES:  I'm sorry if we said that.  I don't think

1    we planned to file a second 12(b)(6).  We planned to answer if

2    it was denied.

3            THE COURT:  Okay.  And then the other thing is, as far

4    as the motion to compel, I think it's fine to be in a motion

5    forum, but, technically, what we're talking about there is a

6    petition to compel arbitration under Section 4.

7            MR. MANKES:  Yes.

8            THE COURT:  Or --

9            MR. MANKES:  Under the --

02:52 10            THE COURT:  -- something else.

11            MR. MANKES:  It's under the Federal Arbitration Act.

12            THE COURT:  But bear with me for a minute.  You can --

13    plaintiffs say, We want to be here in court.  You come to me

14    and you say, They can't be here in court.  That's your motion

15    to dismiss.

16            MR. MANKES:  Yes.

17            THE COURT:  But then you're affirmatively asking for

18    some relief.  If they hadn't done anything, if they were simply

19    sitting around saying, We don't want to go to arbitration, we

02:53 20    don't want to go to arbitration, you could have just brought a

21    Rule 4 petition to compel arbitration.

22            MR. MANKES:  Presumably.  I don't know if we have

23    standing at that point without them filing a motion -- without

24    them bringing suit.

25            THE COURT:  You have a dispute under the contract.

1    It's a mutual arbitration agreement, and either side can move

2    to compel arbitration of any dispute.

3         MR. MANKES:  Yeah.  I haven't thought about that, your

4    Honor, but I assume that's correct.  It sounds right.

5         THE COURT:  The reason I'm asking is, because you

6    haven't filed a petition to compel arbitration, I want to be --

7    I'm just trying to be clear of sort of the procedural posture

8    because you say compel arbitration under the Federal

9    Arbitration Act or, in the alternative, under state law.

02:53 10        MR. MANKES:  Yes.

11        THE COURT:  So if I were to picture your motion as a

12   petition, you're essentially saying you have causes of action

13   or you have a right to relief, affirmative relief, under either

14   federal or state law.  Am I tracking your argument?

15        MR. MANKES:  That sounds right.

16        THE COURT:  Okay.

17        MR. MANKES:  The only reason -- sorry.

18        THE COURT:  I don't mean to be overly formalistic.

19   And the Federal Arbitration Act seems comfortable with the

02:54 20   words "motion" versus "petition."  But there is formally

21   something different when you're asking affirmative relief

22   rather than when you're asking to stop the plaintiffs from -- I

23   think you're asking for affirmative relief here.  You're

24   saying, I am asking the court to assist me in getting them to

25   the arbitration table.

1          MR. MANKES:  Yes.  Well, yes, or dismissing the case.

2     I guess our point is that a court is not the proper forum for

3     this matter.  So they brought a lawsuit, and essentially what

4     we're saying is -- that's why, I guess, we have it as a motion

5     to dismiss and to compel arbitration.  Part of it is to keep

6     them from bringing the case in court because we would say,

7     under the parties' agreement, they don't have a right to be

8     here.

9          But, secondary, yes, we didn't just bring it as a

02:55 10   motion to dismiss, so we are not asking the Court to just

11     dismiss it.  So in that sense, we are also seeking affirmative

12     relief where we're saying they shouldn't be here so the case

13     should be dismissed, but the Court should also compel

14     arbitration.

15          THE COURT:  So I will construe your motion as a

16     petition -- motion and petition under Section 4.

17          MR. MANKES:  That's fair enough.  I know this is --

18     I've read it before, but I've haven't looked into the

19     procedural -- the issues that you're raising so I -- you, I

02:55 20   guess, understand what we're seeking, so I really leave it to

21     the Court as to what the appropriate procedural mechanism is.

22     I apologize if it was misstated in our --

23          THE COURT:  No.  I don't mean to be hypertechnical,

24     and I don't know that it's -- I don't know if it's misstated as

25     much as understated.  It's just that if you are -- if you think

1    about something outside of the arbitration world, if you were

2    sued on a tort -- in a tort claim and your response is, you

3    know, not only did I not hurt the plaintiff but the plaintiff

4    hurt me and I want something, you would file a cross-complaint.

5    And so in that sense, technically, you're not just saying knock

6    them out of the case, but you're affirmatively saying, I

7    think -- you're affirmatively saying I want the court -- the

8    enforcement of the court to order them to arbitration.

9         MR. MANKES:  Yes, your Honor.

02:56 10         THE COURT:  Okay.  The other -- then we can sort of

11    proceed into the argument on the merits of it.  But the other

12    question I had, just sort of starting from the end rather than

13    from the beginning, is the joint statement.  You made the --

14    there's a point which says that in the event that this all goes

15    forward, which I note the defendant's position is we shouldn't

16    even be talking about any of this.  But I noted that you took

17    the position that, because of the one-way intervention rule, if

18    I am the one who ends up hearing the case, no summary judgment

19    motions should be filed by the plaintiff before class

02:57 20    certification.

21         MR. MANKES:  Well, we didn't necessarily take that

22    position.  What happened, I guess, with regard to our joint

23    conference statement is a disagreement about how the case

24    should proceed.  We feel -- the defendant feels -- that it was

25    premature to set dates at this point because we have, you know,

1    a motion to compel.  We don't know when you're going to rule on

2    this necessarily so we thought --

3             THE COURT:  I don't know either.

4             MR. MANKES:  So to put dates in place didn't make a

5    lot of sense while the case potentially is under consideration

6    for dismissal.  Plaintiffs' counsel, I believe, put in dates.

7             THE COURT:  But my point isn't the 30 days.  My point

8    is the one-way intervention rule.  I'm trying to figure out

9    sort of just -- starting sort of with the big picture where any

02:58 10    of this may all end up.  You have an agreement and you're

11    saying that this individual, Mr. Austin, has an obligation to

12    go to arbitration.  And then you're saying, in the event that I

13    disagree and we somehow are still stuck here, you're saying

14    that the order of what we would proceed to have happen next is

15    that we should decide class certification first because of the

16    one-way intervention rule.  Am I tracking your procedural

17    position?

18             MR. MANKES:  I think the procedural position --

19    defendant didn't necessarily state a procedural position.  We

02:59 20    are okay with that.  My understanding is -- I should look at it

21    again -- that the procedural piece of it of what should

22    happen -- maybe I'm wrong because we did file this a while

23    back -- was that we were essentially saying that things should

24    be put on hold until there's a decision without anything being

25    said, without any decisions by the Court at this point on --

1       THE COURT:  I got that that was your first position.

2   But then you took a backup position that said, While we

3   disagree that this should be going on at all, in the event that

4   the case proceeds --

5       MR. MANKES:  I see, okay.

6       THE COURT:  -- then there's a proposal.  And the point

7   I'm trying to just narrow in on is not the timing of any of it,

8   but do I understand you to be saying that, if one were

9   litigating these issues, you have a concern of having Mr.

03:00 10   Austin -- having Mr. Austin litigate the merits before deciding

11   class cert because if Mr. Austin is wrong, loses, the next

12   person gets their next day in court, whereas, if Mr. Austin

13   prevails, there's collateral estoppel.  That's what I

14   understood that point to be.

15       MR. MANKES:  Yes, that's definitely a piece of it.  I

16   think it was partly because of that and it was partly because

17   of the way we set up discovery or the way plaintiff was asking

18   for discovery in that we weren't going to do merits-based

19   discovery as the first part of the case.  It was going to be

03:00 20   just class certification discovery.  But, yes, you have it

21   right as to what the reasoning is as far as --

22       THE COURT:  What your reasoning is.  So I will circle

23   back to that.

24       But let's turn to the motion.  It seems to me that the

25   threshold question I need to address is whether I'm addressing

1    whether the Federal Arbitration Act applies or an arbitrator.

2    That's, seems to me, where we start with this argument.  Yes?

3         MR. MANKES:  I would almost -- I think the way I've

4    simplified it a little bit in my mind, which may or may not

5    help the Court, is I think there are two procedural issues and

6    three substantive issues.  So you have the first substantive

7    issue is whether or not the FAA's exemption for transportation

8    workers applies here.

9         THE COURT:  Why are you categorizing that as a sub --

03:01 10        MR. MANKES:  I guess it's whether or not the FAA

11    applies here and whether or not the court has jurisdiction.  I

12    guess, technically, it could be procedural or some mix of it.

13        But the question is -- the first question is whether

14    or not the FAA even applies so the court has jurisdiction to

15    order arbitration under the FAA.

16        THE COURT:  Yes.

17        MR. MANKES:  And to complicate the matters, you have

18    the Oliveira case which said that that's an issue for the court

19    to decide.  But now the Supreme Court has taken on cert, and

03:02 20    there's a mix in the circuits -- there's a conflict in the

21    circuit.  I guess it's a little bit at least in the gray area

22    now as to whose role that is, the judge or the arbitrators.

23        Then the other understanding piece of this that

24    complicates things further is should you rule that it's for the

25    court to decide and should you rule that Mr. Austin does fall

1   within the transportation exemption of the FAA, then you have

2   -- there are questions relating to whether or not it falls

3   under the Massachusetts Arbitration Act.

4              THE COURT:  Right.

5              MR. MANKES:  And our argument there would be, at a

6   minimum, that issue, you know, should it come to that issue --

7   because you only get to that issue if you decide that the FAA

8   doesn't apply -- then that issue, under the delegation clause

9   in the agreement, should go to the arbitrator to decide because

03:03 10   the -- I can get into why.

11             THE COURT:  Maybe we should sort of delineate the sort

12   of order of issues.  Regardless of whether you think I should

13   be doing it or the arbitrator or the gray area, the first

14   question that I need to figure out today is whether I should be

15   deciding whether I have -- well, the way I frame the answer

16   might give me -- the way I frame the question might give the

17   answer.  It seems to me the first question is do I have

18   authority to order -- authority to order them to order Mr.

19   Austin to arbitration.  That's sort of the first question.  And

03:03 20   in order to do that, you have to show me that there's a statute

21   or a provision that gives me that authority.  And you're saying

22   the statute or provision that gives me that authority is either

23   the Federal Arbitration Act or the Massachusetts.  If you're

24   wanting to say it's under the Federal Arbitration Act, then I

25   have to decide if they fall within the exemption or not.

1          MR. MANKES:  So that's a piece of it.  And that's why

2     I was saying it gets a little complicated because the other

3     issue is who should be making those decisions.

4          THE COURT:  But that's -- I guess the question is --

5     the question I have is -- well, go on.  I shouldn't cut you off

6     there.

7          MR. MANKES:  Just under the delegation clause,

8     arbitrability issues, you go to the arbitrator.  That's what

9     the parties agreed on.  So when it comes to whether or not the

03:04 10    FAA applies, <u>Oliveira</u> has placed that into question or at least

11    -- actually didn't.  It came to a determination on that, that

12    that's for the court to decide.

13          The reasoning in that case is because the court --

14    <u>Oliveira</u>, the First Circuit said that, without there being some

15    determination whether or not there's FAA -- preemption, whether

16    FAA covers this.  If the FAA doesn't cover it, you really, as a

17    court, do not have the jurisdiction to send the case to

18    arbitration under the FAA.

19          But if all that disappears because you decide the FAA

03:05 20    is just not applicable here, then you have still the state

21    court issues.  Then you definitely should have jurisdiction

22    under the Massachusetts Arbitration Act to decide whether or

23    not the case should be arbitrated under that statute.

24          But then it brings up the delegation issue again.  So

25    there, there are different concerns and different rationales as

1    to who should then decide whether or not this case should

2    proceed in arbitration under the Massachusetts Arbitration Act

3    because the jurisdictional issues don't arise when it comes to

4    the Massachusetts Arbitration Act.

5        THE COURT:  Don't I still have to find that under --

6    let's assume we were just moving straight to the Massachusetts

7    statute.  Don't I still have to find that this is an agreement

8    that would be upheld by federal law?  You're saying that is

9    something that it goes to the arbitrator to decide whether the

03:06 10  arbitrator would have jurisdiction?

11        MR. MANKES:  If you decide, if you follow <u>Oliveira</u> and

12    you decide, well, this is for the court to decide in the first

13    instance, and then you decide that the case is not covered by

14    the FAA, the FAA does not apply, then my understanding is that

15    federal law would then be out of the picture, and you would be

16    looking at the case under state law.

17        And then the next question arises, well, now that this

18    is coming under state law and the Massachusetts Arbitration Act

19    applies, should the judge, indeed, the court, be deciding that

03:06 20  issue, or do I make the decision as this court on the federal

21    issue, the FAA issue, or under the delegation clause then, do I

22    send it to the arbitrator to make the determination whether or

23    not the Massachusetts Arbitration Act applies?  And it does

24    apply.  The question really is -- it's not whether it applies.

25    It's whether or not a class action waiver such as this is

permissible under the Massachusetts Arbitration Act.

THE COURT:  But doesn't the agreement carve out that question, whether the class action waiver is valid?  Isn't that the exact one question that's carved out?

MR. MANKES:  It carves out that piece of it but not with regard to whether or not -- so two different issues.  You have whether or not Massachusetts -- the Massachusetts Arbitration Act would compel arbitration of this case.  And plaintiff has taken the position that, well, it does, but the court shouldn't enforce it because Massachusetts has a public policy, you know, against class action waivers even though we would disagree.  That's not the piece of it that's carved out by the agreement.

THE COURT:  Supposing I say, You know what?  I buy defendant's argument there and it goes to the arbitrator.  Isn't the first question the arbitrator has to decide is whether the class action waiver is valid?  Isn't that carved out and comes back into court?  I find myself in a circle here.

MR. MANKES:  I don't think the arbitrator will be determining whether or not the class action waiver is valid.

THE COURT:  Why not?

MR. MANKES:  Because the arbitrator doesn't have to make that determination.

THE COURT:  So does anyone -- in your scheme, does anyone ever consider whether the class action waiver is valid?

1       MR. MANKES:  Yes.  In my scheme, the court makes that

2  determination right off the bat.  So that's --

3       THE COURT:  So that issue -- before you get -- so

4  aren't you coming in here saying cross out their class -- her

5  class action allegations?  Isn't that essentially what you're

6  saying, is she may not proceed with class action allegations

7  here?  Isn't that sort of the first start?  Because the sort of

8  jumping back and forth of who it's going to, doesn't it -- at

9  the end of the day, aren't you saying there's a class action

03:09 10  waiver, and they may not proceed with the class, and I need to

11  find that?

12       MR. MANKES:  Yes.  So a piece of it -- yes.  A piece

13  of it is whether or not you can have a class action waiver such

14  as there is in this case.  That was the next point I was going

15  to get to, which, I think, is the other question, the final

16  question, I think, is before this Court.  That might be the

17  wrong order.  Maybe the Court has to figure that out first.

18       But one of the questions is, is the class action

19  waiver valid?  That's the issue that's before the Supreme Court

03:09 20  right now in Epic Systems and D.R. Horton and the three --

21  trilogy of cases that are now pending.  That is a critical

22  question.  I would agree that --

23       THE COURT:  But when you come in here and you're

24  saying I should -- let's come in and let's dismiss the case.  I

25  mean -- again, I don't mean to be sort of sitting back on my

1    Rules of Civil Procedure but just sort of trying to orderly

2    going through the things on my docket.  There is a complaint.

3    And somehow we've got to get to the question of whether the

4    class action waiver is valid or not.  And you're saying I

5    should dismiss this case because it should go to the

6    arbitrator, and then the arbitrator has to decide everything.

7    But before I get to that question, I have to decide the class

8    action waiver question, don't I?

9         MR. MANKES:  You do, yes.  You have to -- that's

03:10 10  something you have to decide -- I don't think there's a

11   question as to whether the way it's worded in this agreement is

12   valid.  At least I didn't see an argument in that sense.  It's

13   just whether or not -- it's almost trying to read tea leaves as

14   to what the Supreme Court is going to rule on that issue.  So I

15   would agree with you.

16        I guess another thing we could have done is sought to

17   stay this case.  It's just wasn't something the parties were

18   able to agree to -- stay the case pending the Supreme Court

19   determination.  I guess that would be the other option since I

03:10 20  would agree that what Supreme Court decision ultimately says is

21   going to have significant -- is going to have great

22   significance to the Court's evaluation of this matter.

23        THE COURT:  And am I correct that the Supreme Court

24   case does not address the opt-out issue?

25        MR. MANKES:  It may.  I believe -- and I'm not a

1    hundred percent sure.  I believe one of the three cases might

2    have had an opt-out provision in.  It's still up to the Supreme

3    Court, I guess, as to what extent they're going to address

4    that.

5          THE COURT:  Did they -- there were three cases which

6    cert was granted, but there was -- was there one case that was

7    argued and the other two stayed, or were they all combined, all

8    combined?

9          MR. MANKES:  I believe they were all combined.

03:11 10         THE COURT:  Okay.  So we may or may not get an answer

11   to that.

12         To some degree -- you know, I'm looking at this thing

13   and I'm -- there are many, many interesting aspects to this

14   case, and there are many things that I would be happy to add or

15   subtract from what the First Circuit decision is or the other

16   circuit decisions that are out there that are all in front of

17   the Supreme Court.

18         But it does seem to me that sort of a threshold

19   question is what are the order of things I need to decide?  And

03:12 20   which of those should I or should I not be working on between

21   now and June 20th?

22         Maybe I should let your sister respond here.

23         MS. LISS-RIORDAN:  Thank you.  So I think, stepping

24   back big picture for a minute, our challenge to the arbitration

25   clause, as everyone knows, is the arbitration clause won't

1    allow for a class action.  The reason why we're here having

2    this fight is because of the class action waiver.  Because

3    DoorDash's agreement specifically does carve that out and

4    specifically says that a court must address whether class

5    action waiver is available, we say that does put it in your

6    hands to decide rather than an arbitrator's because all these

7    arguments we're making, both in the transportation worker

8    exemption as well as the NLRA argument, they're all arguments

9    getting at why this can't -- this agreement with a class action

03:13 10   waiver can't be enforced.  So I think under the terms of

11   DoorDash's own agreement, that is for the Court to decide.

12          But another point that I wanted to make with respect

13   to their argument that there's a delegation clause here is

14   that, in the Oliveira v. New Prime case, the First Circuit --

15   there was a delegation clause in that case; and notwithstanding

16   the delegation clause, the First Circuit said that this is an

17   antecedent threshold issue.  The court must decide about the

18   applicability of the FAA.

19          THE COURT:  And I think that I -- not only did the

03:13 20   First Circuit say that, but I think I would independently agree

21   with that as to the FAA.  But I guess the question that your

22   brother is raising here is does that same question apply under

23   the Massachusetts Arbitration Act where you're not saying --

24   both sides are conceding that -- or there's no dispute that the

25   -- that statute does apply.  And the only question is, in this

1    case -- you know, if you don't have an exemption that it

2    doesn't cover this class of people or that there wasn't an

3    agreement or anything of that sort.  Your argument is that in

4    this case public policy suggests it shouldn't be enforced, not

5    that they don't fall within it.

6            MS. LISS-RIORDAN:  Right.  So I have two responses to

7    you.  First off, notably in DoorDash's agreement, it

8    specifically says -- just before the delegation clause, it says

9    that the parties expressly agree that this agreement shall be

03:14 10   governed by the FAA even in the event contractor and/or

11   DoorDash or otherwise exempted from the FAA, meaning our

12   argument -- our first argument we've made in our papers is that

13   plaintiff is exempted from the FAA.  That doesn't mean the FAA

14   doesn't apply here.  So I think Oliveira v. New Prime would

15   mean that this is for you to decide, this exemption,

16   notwithstanding this delegation clause.

17           THE COURT:  I didn't follow this argument.

18           MS. LISS-RIORDAN:  Okay.

19           THE COURT:  The Oliveira argument was:  For me to have

03:15 20   authority to order arbitration, there has to be authority under

21   the FAA to order it, and then it said we have to decide that in

22   the first instance.  I think the briefs argued back and forth

23   that even if I didn't have authority under the Federal

24   Arbitration Act the next question would be whether I have

25   authority under the Massachusetts Arbitration Act.  It seems to

1   me you're now saying something very different, which is there's

2   a contractual agreement which means something, and I'm not sure

3   what you're saying it means, but there's a contractual

4   agreement of how to handle the parties' relationship in the

5   event that this worker is found to be an exempt employee under

6   the FAA, Federal Arbitration Act.

7           MS. LISS-RIORDAN:  Right.  So I have a slightly

8   different argument as it concerns the FAA and as it concerns

9   the MAA.  All I'm saying is that I think it should be for you

03:16 10   to decide, not an arbitrator to decide, whether Mr. Austin is

11   exempt from the FAA.

12           THE COURT:  That part I'm agreed on.  Let's --

13           MS. LISS-RIORDAN:  Now if we go to the MAA.  Let's say

14   that the FAA does not apply because he is exempt, and then you

15   have to apply the MAA.  So our argument is that Massachusetts

16   law, stripped of federal preemption because federal law

17   wouldn't apply, is that class action waivers are, in and of

18   themselves, illegal under <u>Feeney</u> and <u>Machado</u>.

19           THE COURT:  I understand that argument.  But the

03:17 20   question that your brother is raising is who hears that, me or

21   the arbitrator?

22           MS. LISS-RIORDAN:  Yes.  My next sentence is going to

23   go to that argument because we're saying that Massachusetts

24   public policy does not allow class waivers and compelling

25   individual arbitration.  Even to compel that threshold issue to

1    arbitration would itself violate Massachusetts public policy.

2    That's why that issue can't go to an arbitrator, because if you

3    compel individual arbitration even to just decide that

4    threshold issue, that would be violating Massachusetts public

5    policy.

6              THE COURT:  Why isn't the simple answer in all of this

7    -- I can go one of two routes.  I can muck through some of the

8    difficult questions of the FAA and delegation, both of those

9    things, or I can jump to the end of the line and say -- I

03:18 10   guess, as I'm saying it, I'm realizing why I can't jump to the

11   end of the line.  But it seems to me I need to be the one

12   making the determination under the agreement.  I need to be

13   making the determination as to whether the class action waiver

14   is valid or is not valid.

15             MS. LISS-RIORDAN:  Which is --

16             THE COURT:  Everybody agrees with that?

17             MS. LISS-RIORDAN:  All of these arguments are really

18   going to that question.

19             MR. MANKES:  We don't disagree with that.

03:18 20            THE COURT:  Okay.  So if I turn this thing upside down

21   and say, Okay, the defendant wants this whole case sent to

22   arbitration and the plaintiff doesn't want the whole case sent

23   to arbitration, but both sides agree that under whatever

24   theory, at some point the question needs to be resolved by the

25   judge as to whether a class action waiver in this set of

1   circumstances is or isn't appropriate.  Is that a correct way

2   of sort of framing where we are?

3            MR. MANKES:  Yes, I believe so.

4            THE COURT:  Okay.  Then do I need to know, to answer

5   that question, whether I'm proceeding under FAA or

6   Massachusetts law?

7            MS. LISS-RIORDAN:  Well, so we have two arguments that

8   we've made.  So, again, if you agree with our initial argument

9   about the FAA exception, then, yes, you would be looking under

03:19 10   Massachusetts law.  Of course, the second argument --

11            THE COURT:  I'm sorry.  My question is a little

12   different.  My question is:  Does it matter?  As I'm trying to

13   figure out the class action waiver question, does it matter?

14   It may but does that -- does it depend -- does the class action

15   waiver question now depend -- and maybe it does -- on whether

16   we're proceeding under the FAA or under Mass. arbitration?

17            MS. LISS-RIORDAN:  Yes.  So putting aside the NLRA

18   argument -- under the NLRA argument, of course, it doesn't

19   matter.  But if you're not getting to Part 2 of our brief yet,

03:20 20   and you're just focusing on Part 1 of our brief, it does matter

21   because under the FAA we have Concepcion and American Express.

22   So it's not good for us if we're under the FAA.  That's why we

23   want to be under the MAA.  So that does make all the difference

24   to this question.

25            THE COURT:  So I do have -- the decision-making line I

1    have to go not to get to the question of -- not just to get to

2    the motion to compel but to address the part of the dispute

3    that the parties both agree should be in front of a judge, I

4    need to decide am I under the Federal Arbitration Act, in which

5    case the only argument that's been raised for why the class

6    action waiver would stand up is the NLRB argument which the

7    Supreme Court has in front of it, or are we under the

8    Massachusetts one?  In which case there's the question as to

9    whether the case you're relying on is correct or not, which

03:21 10    your brother disagrees with.

11         MS. LISS-RIORDAN:  I think that's right.  I think the

12    only reason I sort of said it a little differently before is,

13    under the agreement the FAA applies, but then the question is

14    whether he's exempt under the FAA.

15         THE COURT:  I think we're saying the same thing,

16    whether -- so the decision tree, which is not that different

17    from how you have it in your brief -- but it's not focused

18    first on the motion to compel.  It's focused on the threshold

19    question in my mind, which is -- that needs -- threshold

03:21 20    question is the wrong word.  The overarching question that

21    needs to be determined is, is the class action waiver

22    enforceable?

23         And then I have to decide, am I analyzing that

24    question under the FAA or is he subject to the exemption?  If

25    I'm analyzing it under the FAA, then what do I think of the --

1   or what does the Supreme Court think of the NLRA argument?  If

2   I am thinking about it under Massachusetts law, then I have to

3   figure out who's right and who's wrong on the status of

4   Massachusetts law.  Is that a fair decision-making tree?

5   MR. MANKES:  Yes.  The only thing I'd add, one of our

6   arguments, if you reviewed it on a state court level, would be

7   that the state court is -- the state statute is worded almost

8   identically to the federal statute and is supposed to be

9   interpreted consistent with that.  So we would say that's how

03:22 10   the Supreme Court ruled on it.  When it comes to the FAA, we

11   present the argument that state court should be interpreted

12   similarly.

13   THE COURT:  And so what I understand the difference on

14   your substantive law on the Massachusetts is the plaintiffs'

15   argument is:  Look to the Supreme Judicial Court's decision

16   before Concepcion; and you're saying, No, what the Supreme

17   Judicial Court is saying is, now that the federal law has been

18   changed to mean X, we track the federal law; so, therefore, we

19   will do the same under Massachusetts law.

03:23 20   MR. MANKES:  We're saying both actually.  Even when it

21   comes to the prior law in Massachusetts, we don't believe it

22   has been interpreted broadly to cover a claim like this.  When

23   you actually look at the Feeney and Machado, we don't see this

24   covering a case like this.  Feeney dealt very specifically with

25   93A claims and a public policy that was very specific to 93A

1    claims and the unique type of claims that are brought when it

2    comes to commercial arbitration.

3         And then all Machado did was bring some of the

4    reasoning from Feeney to wage-and-hour claims but said

5    specifically -- was using the reasoning that we're applying the

6    reasoning from Feeney to wage-and-hour cases in this situation,

7    which is the Machado situation, because we need to look into

8    that same concern that was an issue in Feeney, was whether

9    without collective or class actions someone would actually be

03:24 10    able to reasonably get relief given the significance or

11    insignificance of their damages.

12         MS. LISS-RIORDAN:  I think there's another step there,

13    actually, in the Machado case.  I think what Machado did was

14    that it adopted Feeney for wage claims.  It applied -- it said

15    it didn't just apply to consumers.  It also applied to

16    employees.  It then held the class waiver -- the arbitration

17    agreement with a class waiver was enforceable because of this

18    federal case law interpreting the FAA.

19         So, in other words, the SJC was saying, were it not

03:24 20    for this federal case law, this class waiver would violate

21    Massachusetts public policy, but federal law preempts state

22    law.

23         THE COURT:  Are there any state cases since then?

24         MS. LISS-RIORDAN:  State cases in which the federal

25    law did not apply?

1          THE COURT:  The argument that you're making here has

2     been affirmed by state court.  Because it seems to me -- I

3     understand your argument.  It seems to me the counterargument

4     is the SJC, writing on a blank slate, says our public policy

5     trumps.  But once the federal determinations come down, does

6     the SJC say our interest in having this follow and generally be

7     similar to the Federal Arbitration Act would somehow be a

8     countervailing thing?  I don't --

9          MS. LISS-RIORDAN:  Okay, a couple things.  One is, I

03:25 10   think what happened was after -- I mean, if you look at

11     Machado, the reason why it -- in the same breath that it said

12     Feeney applies to wage claims but then said but this agreement

13     is enforceable was because it was citing to federal cases under

14     the FAA.  I'm not aware of any cases in Massachusetts that have

15     actually decided the issue post-Machado because the FAA is

16     always there.  This transportation exemption obviously is an

17     example of which -- is how the federal law could be stripped

18     away.

19          I do believe there have been cases outside of

03:26 20   Massachusetts that have found the transportation worker

21     exemption to apply and so, thus, state law has been looked at.

22     I can't tell you the case off the top of my head.  I can submit

23     it if you're interested in seeing it.  But I think it's

24     Colorado.

25          THE COURT:  No.  I was more specifically questioning

1  whether, under the state -- Massachusetts state cases there's

2  any authority one way or another.

3       All right.  I think I have a general decision tree.

4  Let me start now back with all of that.  I don't mean to be

5  jumping back and forth, but I'm going to -- I was sort of

6  trying to sort of figure out what I do need to decide, what I

7  don't need to decide.

8       So on the question of who has to decide, who doesn't

9  have to decide, that the First Circuit held and it's now --

03:27 10  cert has been granted, I don't need to really worry about that

11  because, no matter what, I have to decide this class-action

12  question.

13       The next question, which was also in Oliveira, which

14  is how are contracts of employment interpreted, I do have to

15  decide, but cert has been granted on that as well.

16       MS. LISS-RIORDAN:  Right.  So here's what I have to

17  say about Oliveira.  What the First Circuit did in Oliveira was

18  said that you don't even ^ need to decide whether they're

19  employees or independent contractor ^ s because contracts of

03:28 20  transportation apply to both.

21       THE COURT:  Contracts of employment and

22  transportation.

23       MS. LISS-RIORDAN:  Contracts of employment and

24  transportation, right, apply to both regardless of what they

25  actually are.

1          THE COURT:  Isn't that up on cert?

2          MS. LISS-RIORDAN:  Yes.  That's up on cert.  There's

3   another approach that has been taken, for example, in the Ninth

4   Circuit in which -- in the <u>Swift Transportation</u> litigation.

5   The Ninth Circuit has determined, rather than taking the

6   <u>Oliveira</u> approach of saying it doesn't matter, we don't even

7   need to figure that out, it's taken the approach that the

8   district court should make a preliminary determination for

9   purposes of determining whether the Section 2 exemption

03:28 10   applies -- I'm sorry, the Section 1 exemption applies as to

11   whether or not the workers or employees are independent

12   contractors.

13          One thing you could do, if you don't want to wait

14   until next year when the Supreme Court decides this, is just go

15   ahead and make that decision as a preliminary determination,

16   which would be a more conservative approach than what the First

17   Circuit did in <u>Oliveira</u>.

18          THE COURT:  I mean, I also -- I can make -- so I can

19   -- right.  I can do either of those things.

03:29 20          Let me ask this question in terms of what is in front

21   of me, what should be in front of me and so on.  When something

22   is filed as a motion to dismiss, I'm looking at the complaint.

23   It's filed as a petition to compel arbitration, I was looking

24   at -- I think you look at all the documents that were filed

25   with it, which were your motion papers there.

1          What would be appropriate for me to look at and what's

2     the standard?  I mean, am I essentially deciding the ultimate

3     question or -- as a matter of fact, or am I -- based on the

4     pleadings, or is it a shortened summary judgment?  What's the

5     standard if I were to do that?

6          MS. LISS-RIORDAN:  Well, what happened in the Swift

7     litigation is it was considered to be a preliminary threshold

8     determination.  Yes, it did overlap somewhat with the merits,

9     but the district court went ahead and did it.  There was an

03:30 10    abbreviated discovery period, and there was, I believe, summary

11    judgment-like adjudication of that threshold issue.

12         So it does go beyond -- the two ways you can look at

13    it, obviously, are considering it as a pleading standard,

14    because this is a motion to dismiss, or perhaps with the

15    parties consent, or even without the parties consent, the Court

16    could allow for some preliminary discovery to make that

17    threshold determination.

18         MR. MANKES:  Your Honor, if I can back up, I don't

19    think you need to -- there's only certain circumstances where

03:30 20    you'll actually reach that issue.  So, for example, if you

21    decide that the FAA is applicable here and the exemption does

22    not apply, the case just goes to an arbitrator regardless of

23    that question.

24         THE COURT:  No, no, but -- so we're past the question

25    of -- let's assume the case goes to an arbitrator.  It's now

1    back to me to decide the class action waiver question.  In

2    order for me to decide the class action waiver question, I need

3    to decide am I analyzing it under federal law or under state

4    law.  To decide the federal law, I'm back to the question of

5    figuring out does the exemption apply or doesn't the exemption

6    apply.

7           In order to decide if the exemption applies, I could

8    do it one of two ways.  I could do what the First Circuit said

9    and said, as a matter of law, contract of employment is a term

03:31 10   that was used to refer to anybody who was a worker who worked

11   pursuant to an agreement, or I can figure it out some other

12   way.

13          MR. MANKES:  I guess where I'm confused, I don't think

14   the -- there are a couple of different arguments, right?  You

15   have to decide whether the class-action waiver invalidates,

16   essentially, the agreement or it can exist, one or the other,

17   whether you need to strike it or -- because if the class-action

18   waiver is deemed to be invalid, then, yes, under the terms of

19   the contract or agreement, the case would stay with the court.

03:32 20          With regard to that issue -- well, if you look under

21   the FAA, it's really going to turn on, hopefully, the Supreme

22   Court, hopefully, shortly upcoming decisions in the Epic

23   Systems and this trio of cases.  If not, then the question

24   really becomes, well, under state law you have to decide what

25   the Massachusetts Supreme Judicial Court would decide given

1    whatever the Supreme Court decides in the Epic Systems case.

2         I don't know, in any of those situations, whether you

3    need to get to that question whether or not the workers are

4    independent contractors or employees.  It seems to me you only

5    get to that question if you decide three things:  1),

6    class-action waiver is okay, whether it's under the FAA or

7    state law.

8         THE COURT:  But stop there.  How do I decide whether

9    I'm under the FAA or state law?

03:33 10         MR. MANKES:  I think both parties have agreed -- well,

11   not agreed.  There's -- the only decision -- my understanding

12   is the only question of whether you're under the FAA or not is

13   whether or not the individuals fall under the transportation

14   exemption.

15        THE COURT:  Right, which has three parts to it.  There

16   are people who have contracts of employment.  There are people

17   who are engaged in commerce.  What's the third?  There's a

18   third one.  Engaged in interstate commerce.  Maybe it's just

19   the two.

03:33 20        But you have that threshold piece of a person who has

21   a contract of employment.  And Oliveira says it doesn't matter

22   if it's independent contractor or not, but the employer in

23   Oliveira sought cert on that question.  And so --

24        MR. MANKES:  But that question could be moot.  If you

25   were to find that the plaintiff was a transportation worker,

1    which we agree he was a transportation worker so that's not

2    contested.

3          THE COURT:  Right.

4          MR. MANKES:  And he engaged -- if you find that he did

5    not engage in interstate commerce --

6          THE COURT:  That's right.  So I could decide.

7          MR. MANKES:  You don't have to get to that issue.

8          THE COURT:  I could decide either the interstate

9    commerce, and if I decide that in your favor, then I don't have

03:34 10    to reach the other one.  If I don't decide that in your favor,

11    then I do have to reach the first question of whether

12    employment contract includes both independent contractor and

13    employee or if I have to know that they're an employee.

14          MR. MANKES:  Yes.  You would have to decide whether,

15    you know, to -- I mean, <u>Oliveira</u> now says that should be --

16    that they are so that's at least -- I know it's up for review,

17    but that's the --

18          THE COURT:  Isn't it technically vacated when cert is

19    granted?

03:35 20          MR. MANKES:  You know, I thought so and I couldn't

21    find law in the First Circuit that actually said that.  That

22    was my understanding, but I, frankly -- I could not find

23    authority that said that as clearly as you just did it.

24          THE COURT:  I think technically it is, and then it

25    gets reinstated perhaps based on what the Supreme Court does.

1    But I may be wrong.

2         MS. LISS-RIORDAN:  I thought we cited something for

3    the proposition that the law of the circuit is the law of the

4    circuit until it's reversed, but I don't --

5         THE COURT:  I think that is true except where cert

6    petition is granted.  I think that's the problem.

7         MS. LISS-RIORDAN:  Right.  That's what I'm not --

8         THE COURT:  Okay.  So let me ask you a practical

9    question.  There's two possibilities about what this whole idea

03:36 10   of going to arbitration is about.  One possibility is that it

11   is a good-faith way to streamline things and keep costs down.

12   Faster, more efficient, everybody's interest.

13        The other is that it is a way to stop people who might

14   have valid claims from having access to statutory remedies.

15   Assuming that you're in -- you're not trying to or certainly

16   would not state out loud -- but assuming you're not trying to

17   block people from access to their remedies, you have a

18   situation where a question is currently posed, and the question

19   that is currently posed is:  Are these individuals properly

03:37 20   classified as independent contractors or as employees?

21        You've pointed out in your scheduling statement that

22   if you don't resolve the class action first and you're in

23   federal court and you lose against Mr. Austin -- or Mr. Austin

24   loses, you can still have to -- you would still have to

25   relitigate it against every single person who wants to bring

1    it.  And so the advantage of having that decided in one forum

2    is that whoever wins or whoever loses gets a judgment which

3    they can then take up on appeal and it's clean and it is what

4    it is.  In terms of litigation costs for the company, you have

5    this streamlined.

6         If you're deciding this question individually, whether

7    each individual worker is or is not an employee or an

8    independent contractor, is there any collateral -- is there any

9    barring of anybody, any res judicata, any collateral estoppel?

03:38 10         MR. MANKES:  Typically, circumstances are different so

11    I would say generally no.  Most -- I know cases where that's

12    gone on with many arbitrations.

13         THE COURT:  Then aren't you basically walking in here

14    and saying, in the interest of efficiency and reducing the

15    costs for everybody, we are going to -- I don't know how many

16    classes you have.  1,500?  We're going to have 1,500 separate

17    arbitrations on this issue?

18         MR. MANKES:  That has rarely been the outcome.

19         THE COURT:  Because people can't afford to vindicate

03:38 20    those rights.

21         MR. MANKES:  But that's -- I would agree that

22    sometimes that's the case, but that's not one of the arguments

23    here.

24         THE COURT:  I understand it's not the arguments in the

25    papers.  I'm outside the papers here.  I am asking -- I have an

1    obligation under Rule 1, as I have -- I watch things go

2    through, to try to make sure things are going in an efficient

3    way.  I do this at a Rule 16 conference of trying to think have

4    you -- have the parties have an obligation to -- lawyers have

5    an obligation to confer with their clients and figure out

6    what's a cost-effective way of resolving an issue.

7            If you win the argument here that there's no

8    class-action waiver, it may be -- sorry, that the class-action

9    waiver is valid.  If you win that argument, it may be that the

03:39 10   reality of the world is all these people won't exercise their

11   statutory rights.  But I'm not going to go down that road

12   because that seems to me would be a very cynical view of this

13   thing.

14           So what you're saying instead is we're going to give

15   those people their right to individually litigate each one of

16   those cases.  That seems kind of insane.  And if you -- so I

17   guess I'm a little bit -- I understand why the individual

18   claim, did you work 12 hours or did you work 40 hours, I

19   somewhat understand why that you want to assess through an

03:40 20   arbitration rather than through federal court.

21           But I don't understand how the class -- I don't

22   understand how the question of are you or are you not an

23   independent contractor -- I don't understand why you would want

24   to have an arbitrator decide that except -- I can think of no

25   reason except to keep people from exercising their rights.

1          MR. MANKES:  I think one of the issues is, and I think

2    at least the position of a company like DoorDash is, a lot of

3    these individuals' cases are not the same.  That's one of the

4    things we'd argue if we got to certification.  You would have

5    to have mini-trials of every claim anyway because you'd have

6    your one person who picks up a couple of shifts -- not shifts

7    -- a couple of hours a week, you know, turns on their DoorDash

8    app and decides here and there, and meanwhile they're doing ten

9    other jobs.  You might have someone else who commits 50 hours a

03:41 10   week to doing jobs through the DoorDash app.  And there are

11   other circumstances.  They're working for other people.  How

12   often are they working for other people?  What other types of

13   company?  There are all these questions that go into the

14   independent contractor analysis, so I don't know if it really

15   changes the analysis to do it through arbitration or court.

16   You're kind of stuck with those various --

17          THE COURT:  No, but you're stuck with -- if you're

18   honestly saying you're giving people their day in a forum,

19   you're saying, I'm swapping 1,500 for one forum for determining

03:41 20   that.

21          MR. MANKES:  I think there's another way of looking at

22   it.  I think another way of looking at it is what you're doing

23   is, is you're saying to anyone who really, truly feels like

24   they've been misclassified and they've been damaged to that,

25   then they would have an outlet to relatively quickly and

1   relatively inexpensively get their remedy without including the

2   whole putative class.  It's still -- it's allowing anyone who

3   feels aggrieved -- and there's been no argument in this case at

4   least that people can't be aggrieved.  People can't get a

5   remedy.  We're not talking about your credit card cases or some

6   of those wage-and-hour cases where someone might get $10 or

7   $15.  We're talking about, you know, should they be found to be

8   misclassified, at least there's the potential here for

9   significant remedy for every individual who thinks they've been

03:42 10   aggrieved.

11          THE COURT:  I'm somewhat talking in just very

12   practical -- not simplest terms, not what are your legal rights

13   but what's a practical matter.  This is, in part, a Rule 16

14   conference.  I mean, if you -- they do have their rights which

15   means that they have the right to attorneys' fees.  So do you

16   have -- do you pay 1,500 plaintiffs' attorneys to litigate the

17   independent contractor question rather than paying one if you

18   lose it?

19          MR. MANKES:  I think, practically speaking -- now

03:43 20   we're really not talking about this case but, in general

21   experience, what ends up happening is people who feel aggrieved

22   hear about the arbitrations.  A lot of the very good

23   class-action attorneys have a way of getting word out there

24   that these remedies are available.  What's happens -- and it's

25   different in every case.  Many cases the parties will agree

1   let's try five or ten cases, you know, with an arbitrator and

2   see what happens.  At the end of that, sit down and they try to

3   mediate and they settle the case.

4           I've definitely been involved in mass arbitration

5   situations where cases end up getting resolved very efficiently

6   and quickly and without costing either side that much money as

7   opposed to, you know, class action which sometimes -- you know

8   what it's like with the class actions.  Sometimes they can take

9   ten years before anyone sees a dime.  Again, I know I'm getting

03:44 10  into the philosophical points, but that's the only way I know

11  how to address this.

12          THE COURT:  Let's get back -- I found -- I have to

13  say, you know, I don't normally read a scheduling statement

14  together with the briefs.  But I found here, thinking about the

15  scheduling statement, it just sort of seemed this doesn't

16  particularly make sense on resolving it but --

17          MS. LISS-RIORDAN:  I would just say, along those

18  lines, in terms of your authority on a -- for a scheduling

19  order here, I mean, what defense counsel is saying is

03:44 20  theoretically true.  But we know the truth is is that most

21  people who are working these jobs have no idea that they have

22  this right, and they have no idea where to turn if they were to

23  exercise their rights, and they have no idea how much money

24  they might actually be entitled to were they to do so.

25          The reason the defendants -- I think it's no secret.

1    The reason the defendants use these clauses is they want to try

2    to limit their damages, their liability exposure as much as

3    possible just to those few people who happen to hear about it,

4    who happen to hear about the class-action lawyers who are

5    bringing the case.

6         I would submit that what the Court would have the

7    power to do as part of a scheduling order is, if we're going to

8    do that and we're going to let just those people who care to

9    press the claim -- of course, the law should apply to people

03:45 10   whether or not they care to press the claim.  But if that's

11   what has to happen ultimately, if we're not successful in these

12   arguments upending the arbitration clause, is why not get

13   notice to those people so that they can actually make the

14   choice?  Now, I know notice is typically granted in the FLSA

15   216(b) context, and this is not an FLSA 216(b) case.  But I'm

16   not aware of any limitation as a -- for practical purposes for

17   a scheduling order, if we're all going to say -- if you were to

18   say to the parties, Why don't you consider just going to

19   arbitration and taking care of all this in arbitration, our

03:46 20   concern about it is that very few people are going to realize

21   they have rights here.  The reason why so few would exercise

22   them is because they don't have notice of these claims.

23        THE COURT:  I think that's a little further down than

24   I can figure out here today.

25        Let me ask you one other just sort of the arena of

1  questions you were expecting today.  When you advise your

2  clients on settling cases, do you include as a standard

3  provision that the plaintiff not ever apply for work with you

4  again, with this client again?

5       MR. MANKES:  It really depends upon the circumstance.

6  It's very circumstantial and, frankly, it's usually, you know,

7  my clients who drive those demands or needs more than me.

8       THE COURT:  That just feels like part of the sort of

9  class-action picture, is people getting blacklisted once they

03:47 10  put their name forward to ask for an arbitration or to ask for

11  whatever and whether they can continue working for the company

12  if they make that demand or work again for the company if they

13  haven't worked in the past.

14       MR. MANKES:  I mean, typically, that wouldn't come up

15  with current employees.  You know, I know some clients that I

16  have, you know, especially with former employees, if they're

17  going to reach some settlement and less in the class-action

18  context, more in the individual plaintiff context.

19       THE COURT:  I had a case that needed my approval, and

03:47 20  they ended up doing sort of a double-agreement, but they had

21  all of the named people the company was insisting on never

22  coming back.

23       Okay.  So going back to trying to just do this in a

24  little bit more ordered fashion, on the Section 1 argument, I

25  don't think I need to address it in order to decide whether to

1    compel arbitration or not, but I do think I have to decide

2    whether the exemption applies in order to determine what

3    standard to use on the class-action waiver.

4         As to that, there's two arguments for why it would not

5    apply.  The one is the -- is there an employment contract or

6    are they just independent contractors?

7         The other argument is engaged in interstate commerce.

8    Let's talk about that for a minute.  I understand that engaged

9    in interstate commerce is a narrower world than affecting

03:48 10   commerce, but I don't think there's any authority to limit it

11   so much that it means the person has to cross state lines

12   themselves.

13        MR. MANKES:  That's correct, your Honor.  There's no

14   fine line.

15        THE COURT:  So, for example, a postal worker who only

16   delivers mail in their neighborhood is delivering mail that

17   came from a distance.  So is it fair to say that there's sort

18   of two parts about engaged in interstate commerce?  The one

19   part is the fact that they're functioning doing deliveries as

03:49 20   their primary function rather than being an account manager or

21   something of that sort?  And then the second is what the good

22   -- the thing that's in commerce, is it in the stream of

23   commerce or zone or is it not, right?  Is that a fair breakdown

24   of the question I need to figure out?

25        MR. MANKES:  Yes.  I think some of the -- a couple of

1    the cases have said someone has to be so closely related to the

2    interstate commerce.  That's just from of the language some of

3    the --

4          THE COURT:  That doesn't help me anyway.  I was trying

5    to pull it apart.  It seemed to me it had two aspects and so I

6    was -- I'm not sure there's any one case that says it this way,

7    but this is sort of my distilling as I'm trying to read through

8    the cases.  One is, if the person isn't in the delivery

9    transport world, you don't come here.  So the Circuit City

03:50 10   person who's selling the -- whatever the person in Circuit City

11   was doing, doesn't get there.  The account manager, those

12   people aren't doing delivery as their primary function, aren't

13   transport.

14         But the second question is about the goods, and is it

15   a local delivery or is it part of a long interstate delivery,

16   right?

17         MR. MANKES:  Yes.

18         THE COURT:  Okay.  Help me how I make that

19   determination because there doesn't seem to be a whole lot --

03:51 20   there's nothing.  You know, very frankly about the FAA, nobody

21   was using this clause until after Circuit City; and before

22   Circuit City, the understanding was generally who knows whether

23   it would apply and so on.  You don't have a whole lot about

24   what that area is.

25         Plaintiff has cited to the Robinson exception to the

1       antitrust.  Why isn't that the right zone of whatever, not

2       necessarily those particular cases but that area of the law?

3              MR. MANKES:  If you look at those cases, those cases

4       say they're going to analyze it similar to the Sherman

5       Antitrust Act which is interpreted --

6              THE COURT:  No.  They say that, as to Robinson-Patman,

7       it's a more narrow engaged in commerce.

8              MR. MANKES:  Well, they say it's more narrow.  I was

9       reading it carefully.  I saw the same thing.  They were going

03:52 10    to review it.  They said it's more restrictive in its use.  If

11      you read it carefully, it does say that they're going to use

12      though the Sherman Antitrust kind of broad definition to define

13      what engaged in commerce is -- not engaged in commerce.

14      They're not using that term.  It's violation in the course of

15      conduct.

16             THE COURT:  It actually does have "engaged in

17      commerce."

18             MR. MANKES:  I thought it was violation -- it has to

19      be a violation in the course of interstate commerce.  It's a

03:52 20    pay discrimination statute.  My understanding is it says you

21      need to show that the violation occurred in the course of

22      interstate commerce.

23             THE COURT:  Yeah, okay.

24             MR. MANKES:  So when I read --

25             THE COURT:  But it seems to me the difference -- the

1    two worlds of the commerce clause, it seems to me, are:  The

2    big world is anything affecting commerce; and the small world

3    is focused on how goods travel through commerce.

4        MR. MANKES:  Yeah.  Well, the interesting things about

5    those milk cases is -- again, my reading of them shows it to be

6    a broad reading of that term.  While it's more restrictive in

7    its application, the definition is construed broadly.  The case

8    says what it says.

9        THE COURT:  But -- so coming back to why -- it's clear

03:53 10   that, unlike the argument that was made in Circuit City, you

11   know, remembering, when you're reading Circuit City, that they

12   were trying to argue is that it wouldn't apply in any

13   interstate -- any employment concept.  And unlike -- and it was

14   in that context, the Supreme Court says, we're not talking

15   about affecting commerce.  We're not talking about the

16   constitutional limits.  We're looking at things that have to do

17   with delivery and interstate commerce.

18        But it didn't stay beyond that; and within that, we're

19   going to somehow make it even narrower than that.  It seemed to

03:54 20   me it distinguished between transport workers and other

21   workers, but it didn't distinguish that, in the world of

22   transport workers, we can't follow the same thing of tracking

23   the goods.  I'm not sure her milk cases make it there, but I'm

24   just trying to figure out what's the body of law where I'm

25   looking.

1        MR. MANKES:  Not only did the milk cases not make it

2   there, but the milk cases all say, We're going to consider this

3   during the course of interstate commerce because there's milk

4   and it's coming into a state, and then it's being processed.

5   All of them say, it's being processed and not that much goes on

6   in the processing before it then goes out as some other milk

7   product.

8        Now, the interesting thing is, all of those cases

9   actually distinguish a Seventh Circuit case called Central Ice

03:54 10   Cream.  The milk was brought in.  It was turned into ice cream.

11   Even under that broad standard, under the Robinson-Patman Act,

12   they said, well, that's enough.  That's enough of a change

13   where that breaks the chain in interstate commerce.

14        And so, I think, even if you were looking under --

15   even if you decided that the Robinson-Patman standard is the

16   right standard, which I still think from my reading that's

17   broader than was expected because I think there's an analogy to

18   the Sherman Antitrust Act.  But even under that standard, it

19   would seem that what's happening here is more analogous to

03:55 20   what's happening with the milk that gets turned into ice cream.

21   I mean, these are raw materials coming into a restaurant,

22   getting turned into a dinner, and then going out.  If that

23   doesn't break the chain, I'm not sure what does.  I can't think

24   of any -- then every delivery person would fall under this

25   exception and would be interpreted broadly.  It's hard to come

1    up with another -- something else that would change the nature

2    of the goods more than it being turned from ingredients, raw

3    ingredients, into a prepared meal.

4         THE COURT:  So I understand you have a different

5    argument, which is, that there are also soda cans going

6    through.  But putting aside the soda cans, which we can come

7    back to, how is cooking the meal any different than making the

8    ice cream?

9         MS. LISS-RIORDAN:  Well, I would just say -- I would

03:56 10   agree with you that in Circuit City the Supreme Court didn't

11   narrow the definition and the fact there may be a Seventh

12   Circuit case out there that casts doubt on this, when it's

13   processed that's not --

14        THE COURT:  But all of the cases you cited -- I mean,

15   part of the reason I sort of found the -- landed on the ice

16   cream cases, all of the cases you cited were having an argument

17   with some concept; and the argument with the concept was that

18   there seemed to be a notion -- and I couldn't figure out where

19   that notion came from exactly.  But there seemed to be a notion

03:56 20   that, in deciding who the ultimate consumer was or what --

21   trying to figure out where the ultimate consumer was, you

22   stopped if there was significant processing.  They were all

23   saying, We don't have that much processing here.  We're okay.

24   It's only a little bit of skim milk that's being taken out.

25   We're not -- putting a little bit of chocolate and sugar isn't

1    that big.  They were arguing against something.

2         MS. LISS-RIORDAN:  Right.  But the question is, on a

3    national level, is that really the standard?  Do you have to

4    look at how much processing there is?  And there is the fact

5    that we have the soda bottles, and it doesn't matter how much

6    of the goods are the non-prepared, prepackaged goods.  Under

7    the Ninth Circuit, the Seven-Up case.  We have that.

8         THE COURT:  Why isn't the goods argument -- if I agree

9    with you that the restaurant has made ice cream and we now have

03:57 10   an order for ice cream and that's not going to give her

11   interstate commerce, why doesn't their picking up and bringing

12   the drinks that come with it, the bottled drinks, why doesn't

13   that get you interstate commerce?

14        MR. MANKES:  I would say that's incidental to what

15   they're doing.  Their bringing prepared meals and bringing a

16   drink is incidental.  There are other situations in some of the

17   cases that we cited where the courts have ruled that that kind

18   of incidental -- that's not, like, their primary job, is kind

19   of transferring for the purpose -- if you look at all the cases

03:58 20   that were cited by plaintiff, I mean, they're all cases where

21   there were kind of goods that were coming in from one state to

22   another, and for the most part I think the inter -- the

23   non-interstate piece of it was simply they got dropped off at a

24   warehouse and sat there for a couple days before someone within

25   the state went and picked them up and then brought them to a

1  retail or wherever else, soda machine, wherever else might send

2  them.

3  Here it's different.  These are quintessentially local

4  people.  These are just people who are going from A to B within

5  a town, from a restaurant --

6  THE COURT:  That part -- I'm focused here on where the

7  goods are.  I understand that every mileage of an interstate

8  journey may be very, very short.  But my question is:  Where

9  are the goods?  And where do I decide the goods have ended and

03:59 10  started again, or is it a continuous goods going through?

11  MR. MANKES:  I would say not.  I would say when

12  they're at the restaurant and they're just being sold to

13  customers or patrons, it had stopped at that point, just like

14  -- again, this is based on this incidental argument.  If I went

15  and got paid for buying ten sodas from a soda machine and then

16  brought them to someone's house and they gave me $10 for doing

17  that, I wouldn't say that would bring me under the narrow

18  interstate commerce exemption, you know, under the FAA.

19  MS. LISS-RIORDAN:  There's also -- another way to look

03:59 20  at it, which we pointed out, is the Lenz factors.  The Eighth

21  Circuit adopted a series of factors to look at.  Here, because

22  the plaintiff is in such -- is so central to the

23  transportation, we're not talking about someone who merely

24  supervised transportation workers, even though such a person

25  was deemed to be part of interstate commerce in the Palcko

1    case, and we're not talking about a company that's not involved

2    in commerce, like a pizza joint.  We're talking about a driver

3    for a company whose mission is to deliver food, food goods.

4           So if you were to look at the Lenz factors and analyze

5    that and there's no one factor, you can consider them together.

6    This is a transportation worker.  It might have been more of a

7    stretch if we were talking about a supervisor sitting in an

8    office with respect to this worker.  This person is right there

9    in the center of it.  I think if you look at the Lenz factors

04:00 10   that makes it more central than having to make these fine

11   distinctions over whether the food was processed at all or too

12   much and how much does that matter.

13          Of course, we do have the fact that there is the

14   nonprocessed goods that are being delivered, not only the sodas

15   but the napkins and the plasticware and -- you know, obviously

16   we haven't done discovery to find out how much of --

17          THE COURT:  I think the problem with your napkins and

18   plasticware is those aren't really goods in commerce.  Those

19   are incidentals.  I mean, that's not what's being purchased.

04:01 20          MS. LIS-RIORDAN:  Being purchased is the service of

21   having a meal being brought to you and --

22          THE COURT:  If you start talking about delivery of

23   service, I think that gets you into a more difficult area.  I

24   think you're --

25          MS. LIS-RIORDAN:  Well, to --

1          THE COURT:  To the extent you're talking about

2     delivery of goods, I think the question then comes is the

3     ultimate end of the delivery the processing plant or is it an

4     individual consumer?  I think that's how those cases go.  I

5     think I need to figure out whether the person who purchases

6     through DoorDash is the ultimate customer of the products

7     coming on or whether the restaurant is the ultimate products,

8     at least for the food served, unless I just go with the drinks.

9     The napkins doesn't sway me.  I don't think that's a good being

04:02 10   sold.

11          MR. MANKES:  Your Honor, I did find that case that

12     talked about the Robinson-Patman Act being interpreted the same

13     as the Sherman Antitrust Act.  It's the case cited by

14     plaintiff, <u>Foremost Dairies</u>.  And it actually says, "The

15     underlying principles applied in defining the term 'in

16     commerce' or 'stream of commerce' under three acts -- Sherman,

17     Clayton, and Robinson-Patman -- are substantially identical.

18     The statute, Robinson-Patman, applies to all forms of

19     interstate commerce, and whoever sends that commerce, the

04:03 20   commerce in question might be considered interstate."

21          THE COURT:  But it's --

22          MR. MANKES:  It's a paragraph talking about how

23     they're interpreted identically.

24          THE COURT:  But they're still talking about -- they're

25     not talking about the world of things affecting commerce.

1     They're talking about transportation, and they're talking about

2     in a stream of commerce.  They're talking about the movement of

3     those particular goods.  And even in the antitrust cases,

4     they're talking about a stream of goods that are moving as

5     opposed to just this sort of amorphous, anything affecting

6     interstate commerce.  I'll look at that.

7          MR. MANKES:  There is only -- I guess there is one

8     case, and I know it's not controlling.  But the only other case

9     I am aware of is the Levin v. Caviar case in the Northern

04:03 10   District of California.

11          THE COURT:  It's puzzling with the same issues.  I

12    don't think I can defer simply because they reached a different

13    result in it.

14          Okay.  I've got to figure out that piece of it.

15          On the employment contract piece of it, I think the

16    defendant can sort of take two positions here.  Either you can

17    say, I don't think you have to reach it because of the engaged

18    in interstate commerce; and if you were to reach it, we would

19    waive that issue, in which case I don't have to make any

04:04 20   decision.  Or you can say, We want to stand on that as a second

21    reason that we don't think there's an employment contract.  If

22    you take the position that you don't think there's an

23    employment contract, then I have two determinations to make.

24    One is, do I analyze it the way the First Circuit did and say,

25    as a matter of law -- why don't you talk with your client, and

1      I'll regain my thoughts back.

2      (Discussion held off the record.)

3          MR. MANKES:  Obviously, we'd prefer not to waive it,

4   and it's hard to state what we want to do without knowing how

5   the Court would want to address that issue.  We certainly would

6   not be in favor of doing some type of mini-trial over that

7   ultimate issue to decide whether the ultimate issue goes to

8   arbitration because that's kind of -- it seems counterintuitive

9   to the arbitrator deciding the ultimate issue.  Again, I don't

04:05 10   know how you would --

11          THE COURT:  So my first read of it is that I think the

12   First Circuit is right, as a matter of law, that if you go back

13   to 1925, I don't think anyone was distinguishing between

14   independent contractor and employee.  That wasn't the issue.

15   The question was workers.  And I think what goes along

16   historically with that is the fact that there's seamen in here.

17   And seamen were quintessentially in that gray area because

18   they'd go out on a ship.  So they would be pay by a share of --

19   the fishermen at least would be paid by a share of the catch.

04:06 20   And so there was this very -- and they would report to the

21   captain, and the captain didn't own the ship.  So there were

22   all these ambiguous things, but the one thing there was was

23   that there was a contract that specified that they got this

24   money.  And I think they were considered -- these would be

25   considered an employment contract.

1          From those two things, just sort of the general things

2     that are stated in the Oliveira case and sort of my own sense

3     of the seamen -- the history about seamen and stuff, I don't

4     think that this language was intended to differentiate between

5     employees and independent contractors.  So my current reading

6     would be to follow what the First Circuit says on that and say

7     not that I make a determination that these people are employees

8     but that I make a determination that the statute covers

9     workers.  So if you're comfortable with that, then that takes

04:07 10     the having to make that determination off the table until we

11     figure out the class-action waiver piece of it.

12          MR. MANKES:  We're comfortable with you ruling that

13     way, yes.  That's obviously -- we defer to the Court on that.

14          THE COURT:  So that's those issues.

15          The question of -- my sense is, on the Section 1

16     issues, I should just get to those because it's going to take

17     too long for the Supreme Court to decide anything, and I don't

18     want to hold anything up.  So the Section 1 issues I will try

19     to address.

04:07 20          As to the NLRB issues, that we're going to get a

21     decision in the next month.

22          MR. MANKES:  I hope.

23          THE COURT:  Well, it was argued to -- it was argued at

24     the beginning of the term, and they don't have the excuse that

25     they didn't have a full bench so --

1           MR. MANKES:  I agree.  I just thought it would have

2      come out already.

3           MS. LISS-RIORDAN:  We thought it was going to be this

4      morning, so I thought this was going to be an interesting

5      argument today.

6           THE COURT:  I read the four cases that came out this

7      morning -- or read the head notes.  It wasn't one of them so --

8      so I think my inclination on that piece of it is to wait

9      because there's no upside to my coming down with something.

04:08 10          The one question I had on the opt-out was how does

11      someone engage in concerted activity if everyone else is -- or

12      most -- if the majority of people are not opting out, how does

13      this person who wants to engage in concerted activity and

14      exercise their class-action rights, how do they do that?

15          MR. MANKES:  What I would argue, they can talk to

16      whoever they want or get other people to be joint plaintiffs

17      with them in a case.  When you look at the cases that have

18      dealt with this issue, what the -- the reasoning is, so, for

19      example, the Seventh Circuit, you know -- sorry, the Fifth

04:09 20      Circuit with the D.R. Horton, the issue is that you don't have

21      -- the NLRB doesn't protect the right to bring class or

22      collective actions.  That's one of the arguments that the court

23      relied on.

24          THE COURT:  It seems though, while you don't have a

25      right necessarily that's identified as class actions, you do

1    have the right to engage in concerted activity.

2         MR. MANKES:  Well, they can still do that.  They just

3    couldn't bring it as a procedural class action.  There's

4    nothing that prevents -- well, I guess the -- they can bring

5    individual claims, but they could speak to one another.  They

6    could support one another.

7         THE COURT:  But they couldn't bring it together.  I'm

8    talking about the opt-outs, and they would have a right to

9    bring it together.  I'm just saying who are they bringing it

04:10 10   together with.  How do they even find other workers who are not

11   barred from concerted activity with them?

12        MR. MANKES:  Presumably, if they opted out and they

13   filed a class-action lawsuit, then they could proceed with the

14   lawsuit, through the course of bringing class action, I'd

15   assume.  I haven't been in this type of scenario, but I'm just

16   -- off the top of my head, I'm thinking the class-action

17   procedure, should they be able to certify a class, would

18   eventually lead to notice to other people who opted out, I

19   would think.  Again, I'm just thinking out loud here.  I

04:10 20   haven't dealt with that procedural issue personally.

21        THE COURT:  They wouldn't have any way to know who had

22   -- whether anybody -- who had opted out or how many people had

23   opted out.

24        MR. MANKES:  No.  But so, for example, if Mr. Austin

25   had -- had been one of the people who opted out, we couldn't be

1    here compelling arbitration.  The case wouldn't --

2        THE COURT:  But you would be saying he can't show that

3    there's numerosity.

4        MR. MANKES:  Well, I assume that the Court -- and I

5    guess every court is different -- would allow some discovery on

6    some of those certification issues before we were able to

7    assert that effectively, but that would be up to the Court.

8        THE COURT:  It seems to me that figuring out the

9    opt-out question is premature.  I mean, until we figure out

04:11 10   what the Supreme Court is going to say, I'm not sure that makes

11   much sense to do that.

12        And then the remaining issue is the state law issue,

13   which is that, in the event that I find that the FAA exemption

14   applies, then there's not only the NLRA argument, but then

15   there is the state law argument.  Do you want to spend a minute

16   on that and then maybe we call it a day?

17        MR. MANKES:  Just to reiterate -- I know we started

18   getting into it earlier.  It would have been very easy for the

19   SJC to say Massachusetts does not recognize or does not permit

04:12 20   class-action waivers in a very general sense, but they didn't

21   say that.

22        THE COURT:  They can't say that.  That's dicta.

23        MR. MANKES:  They could have even said it in dicta,

24   but they didn't say it in dicta.  In Feeney it was tied

25   specifically to 93A claims and the legislative history of that

1    statute and the language in that statute.  If you actually

2    go --

3         THE COURT:  Isn't that kind of -- the importance of

4    the 93A claims and the public policy, don't you have that in

5    spades on minimum wage?

6         MR. MANKES:  So that's my point, is that when it came

7    to then the Machado case taking Feeney and looking at it in the

8    context of a wage-and-hour case, what they did -- and the only

9    thing they incorporated from the Feeney decision was the public

04:12 10   policy associated with claims where the plaintiff can show they

11   wouldn't otherwise be able to get remedial relief -- or relief

12   because their damages were so insufficient.

13        In that case the court actually -- in Machado actually

14   looked into whether that was an issue in that case, because

15   that was one of the arguments, and decided that, no, that an

16   individual could bring -- could, as a remedy, get enough in

17   damages to make him or her get enough sufficient relief where

18   the class-action waiver was not in violation of public policy.

19   The case actually proceeded.  They actually allowed the

04:13 20   class-action waiver in Machado.

21        THE COURT:  If you were going to litigate an

22   individual's question of whether they are or are not an

23   independent contractor, isn't that a fairly large number of

24   hours that it would take to litigate that issue whether it's in

25   front of a court or an arbitrator?

1          MR. MANKES:  As an individual claim?

2          THE COURT:  Yeah, either way.  Let's say as an

3     individual claim in front of a court.

4          MR. MANKES:  I think any individual claim in front of

5     a court will take a lot of hours.  It will take far fewer

6     hours, I think, than litigating an individual discrimination

7     claim in contrast.  An arbitrator, I don't think it would take

8     very long at all, particularly if the parties, which they would

9     be free to if there were multiple claims, decided to use the

04:14 10    same arbitrator.  There are things that could be done by both

11    parties to make the procedure more efficient.

12         THE COURT:  So here the amount at issue of these

13    claims is what?  15,000 was the ballpark you used on your

14    removal or something of that sort?

15         MR. MANKES:  Yeah, I think that's right.  I have to

16    look.  I'm sorry.  But I think that's right.

17         THE COURT:  So you're spending a lot more -- both

18    sides are spending a lot more than 15,000 to figure out the

19    question of whether someone is an independent contractor or

04:14 20    not, right?

21         MR. MANKES:  Yes.

22         THE COURT:  And yet doing them individually, each one

23    individually, is going to -- you're not going to be precluded

24    by the costs simply because you're saying -- you're saying this

25    is a worthwhile amount versus a $4 consumer claim.  Don't you

```
 1    have to look at it:  It's a worthwhile amount but contrasted to

 2    the amount of lawyer time?

 3            MR. MANKES:  I would think, yes, a defendant would

 4    have to do that.  Plaintiffs, I think -- the plaintiffs'

 5    attorneys have to worry less about that because, if they think

 6    they have a strong case and they win, they're going to get all

 7    their attorneys' fees so if it takes them a long time to

 8    litigate it --

 9            THE COURT:  Wait, wait, wait.  I can't let that one go

04:15 10   by.  A plaintiff's attorney who has to fund the money on their

11    own, take out a loan to do this, and litigate a case, has to

12    think about it less than the defendant's employer who just

13    bills their client?

14            MR. MANKES:  Well, they at least -- I'm considering

15    the plaintiff's attorney versus the defendant company or

16    employer.

17            THE COURT:  Okay.

18            MR. MANKES:  I was taking the defense attorney out of

19    the equation.  People stand to win or lose money --

04:16 20           THE COURT:  Then the plaintiff -- maybe you're

21    comparing the plaintiff, who has no money, and has to beg

22    somebody to take their case on a contingency, versus a

23    defendant who has a regular defendant -- counsel that he'll pay

24    an hourly rate -- okay.  That's neither here nor there.

25            MS. LISS-RIORDAN:  I just wanted to make a comment
```

1   about the Machado and Feeney state of the law when everything

2   left off after Concepcion and AmEx.  What happened was, in the

3   Machado decision, it was decided that the principles of Feeney

4   would apply to wage claims, and the court even noted that it's

5   built into Massachusetts Wage Act, Chapter 149 Section 150,

6   that there's a right to bring a claim on behalf of others

7   similarly situated.  Then the court went on to decide, the SJC

8   went on to decide that, in light of Concepcion, there was a

9   difference between these wage claims that could be very

04:16 10  valuable and the consumer claims that were worth very little.

11  So, initially, the SJC made a distinction but only with a gloss

12  of federal law.

13      Then AmEx came down, and the SJC essentially amended

14  its decision in both Feeney and in Machado and said, well, now,

15  this all -- Massachusetts public policy all goes away because

16  the Supreme Court has spoken.  Everything is preempted by

17  federal law.

18      So if you -- again, that takes me back to, if you

19  strip away federal law, the SJC, in Machado, had said that

04:17 20  Feeney does apply under state law.

21      THE COURT:  If we get there, I will read Feeney and

22  Machado carefully, which I have not done for today's hearing.

23      I am going to try to pull my thoughts together on the

24  question of whether the FAA exemption does or doesn't apply

25  because I need to figure that out in order to know what

1    standard I'm applying for the class-action waiver.  Once I

2    figure that out, I might be having the Supreme Court decision

3    ready for me to turn to that part of it.

4         Let's do this:  How much -- I think it would be

5    helpful, once that decision comes down, if you can briefly give

6    me your reaction on how that affects what we have in front of

7    us.  So how much time after the decision comes out would you

8    like to submit a short supplemental brief?

9         MS. LISS-RIORDAN:  Of course, that depends exactly

04:18 10   what day it gets issued.

11        THE COURT:  We don't know when it's coming down.  So

12   two weeks?

13        MS. LISS-RIORDAN:  A couple weeks, I was going to say.

14        THE COURT:  Does that sound right?

15        MR. MANKES:  Two weeks is fine.  I will defer to my

16   sister.

17        THE COURT:  Why don't I plan on you getting me

18   something in two weeks.  If you need more time, just talk with

19   each other and let me know.  We don't know if it's going to be

04:19 20   seven separate opinions coming down or what we have.

21        MR. MANKES:  500 pages.

22        THE COURT:  Right, or whether it's the last opinion of

23   the term being read with two dissents or something of the sort.

24        Thank you very much for the argument.  I will try to

25   get something -- I won't do a scheduling order until I get

1   through this first piece of it.

2           MR. MANKES:  Thank you, your Honor.

3           MS. LISS-RIORDAN:  Thank you, your Honor.

4           THE CLERK:  Court is in recess.  All rise.

5   (Whereupon, at 4:20 p.m. the hearing concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4           I certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of my skill and ability.

7

8

9

10

11

12    /s/Cheryl Dahlstrom

13    Cheryl Dahlstrom, RMR, CRR

14    Official Court Reporter

15

16    Dated:  June 18, 2018

17

18

19

20

21

22

23

24

25